UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

KIMBERLY D. TRACZYK, individually,
and as representative of a Class of
Participants and Beneficiaries
of the Aspirus, Inc. Retirement Plan,

      Plaintiff,

    v.

ASPIRUS, INC.,

    and

THE BOARD OF DIRECTORS
OF ASPIRUS, INC.,

    and

JOHN DOES 1-30,

      Defendants

Case No.

**CLASS ACTION
COMPLAINT
FOR CLAIMS UNDER
29 U.S.C. § 1132(a)(2)**

---

## COMPLAINT

---

COMES NOW Plaintiff, Kimberly D. Traczyk, individually and as representative of a Class of Participants and Beneficiaries on behalf of the Aspirus, Inc. Retirement Plan (the "Plan"), by her counsel, WALCHESKE & LUZI, LLC and HANEY LAW FIRM, P.C., as and for a claim against Defendants, alleges and asserts to the best of her knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.      The essential remedial purpose of the Employee Retirement Income Security Act ("ERISA") is "to protect the beneficiaries of private pension plans." *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir. 1986).

2.      The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments *as well as* a continuing duty to monitor fees and expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. §1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan"); 29 C.F.R. §2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment." It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution Plan." *Tibble,* 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

> *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

3.      Defendants, Aspirus, Inc. ("Aspirus"), the Board of Directors of Aspirus, Inc. ("Board Defendants"), and John Does 1-30 (collectively, "Defendants"), are ERISA fiduciaries as they exercises discretionary authority or discretionary control over the 403(b) defined contribution pension plan – known as the Aspirus Inc. Retirement Plan ("The Plan") – that it sponsors and provides to its employees.

4.     Plaintiff alleges that during the putative Class Period (January 1, 2018 through the date of judgment),[1] Defendants, as fiduciaries of the Plan, as that term is defined under ERISA, 29 U.S.C. §1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, among other things: (1) authorizing the Plan to pay unreasonably high fees for retirement plan services ("RPS"); (2) failing to objectively, reasonably, and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; (3) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs; and (4) failing to disclose to Plan Participants fees associated with the Plan.

5.     These objectively unreasonable RPS fees and investment selections cannot be justified. Defendants' failures breached the fiduciary duties they owed to Plaintiff, Plan Participants, and beneficiaries. Prudent fiduciaries of 401(k) Plans continuously monitor fees against the market rates, applicable benchmarks, and peer groups to identify objectively unreasonable and unjustifiable fees. Defendants did not engage in a prudent decision-making process, as there is no other explanation for why the Plan paid these objectively unreasonable fees for RPS and investment management.

6.     To remedy, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) to enforce Defendants' liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from their breaches of fiduciary duty.

---

[1] The Class Period is truncated from the normal six-year look-back period because Empower became the primary retirement plan service provider on January 1, 2018, and Aspirus Ironwood Hospital employees, including Plaintiff, became part of the Plan on that date as well.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. §1331 and pursuant to 29 U.S.C. §1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §1001 et seq.

8.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

9.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

10.     In conformity with 29 U.S.C. §1132(h), Plaintiff served the Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

11.     Plaintiff, Kimberly D. Traczyk, is a resident of the State of Michigan and currently resides in Ironwood, Michigan, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

12.     Since March of 2020, Plaintiff has worked as a Physician Assistant in Orthopedics at the Aspirus Ironwood Hospital, in Ironwood, Michigan.

13.     Plaintiff's employment with Aspirus continues to the present.

14.     Plaintiff has Article III standing to bring this action on behalf of the Plan because she suffered an actual injury to her own Plan account in which she is still a Participant, that injury

is fairly traceable to Defendants' unlawful conduct, and the harm is likely to be redressed by a favorable judgment.

15.     It is well settled, moreover, that recovery may be had for the Class Period before Plaintiff personally suffered injury, as that turns on ERISA §502(a)(2) on which his claim rests. This claim is brought in a representative capacity on behalf of the Plan as a whole and remedies under ERISA §409 protect the entire Plan. Courts have recognized that a plaintiff with Article III standing, like Plaintiff, may proceed under ERISA §502(a)(2) on behalf of the Plan and all participants in the Plan. Plaintiff may seek relief under ERISA §502(a)(2) that sweeps beyond his own injury and beyond any given investment he has held as a Participant in the Plan.

16.     The named Plaintiff and all Participants in the Plan suffered ongoing financial harm as a result of Defendants' continued imprudent and unreasonable investment and fee decisions made with regard to the Plan.

17.     The named Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the RPS fees, investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized Plans, total cost comparisons to similarly-sized Plans, and information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

18.     The named Plaintiff and all Participants in the Plan, having never managed a large 401(k) Plan such as the Plan, lacked actual knowledge of reasonable fee levels and prudent alternatives available to such Plans.  Further, Plaintiff did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including

Defendants' processes for selecting and monitoring the Plan's retirement plan service provider (RPSP) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth below.

19.     Aspirus, Inc. ("Aspirus") is a non-profit, community-directed health system with its principal headquarters located at 2200 Westwood Drive, Wausau, Wisconsin 54401. The facility at which Plaintiff works, the Aspirus Ironwood Hospital, is located at N10561 Grand View Lane, Ironwood, MI 49938. In this Complaint, "Aspirus" refers to the named defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

20.     Aspirus is a health system with 8,700 employees. It has four hospitals in Upper Michigan and six hospitals in Wisconsin, more than 50 clinics, home health and hospice care, pharmacies, critical care and air-medical transport, medical goods, nursing homes, and a network of physicians.

21.     Aspirus acted through its officers, including the Board Defendants, and their members (John Does 1-10), to perform Plan-related fiduciary functions in the course and scope of their business. Aspirus appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Aspirus is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

22.     Aspirus is both the Plan sponsor and the Plan Administrator of the Aspirus, Inc. Retirement Plan.

23.     As the Plan Administrator, Aspirus is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a).

Aspirus has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

24.     Aspirus in its Plan Administrator capacity, as well as individuals who carried out Plan functions (John Does 11-20), are collectively referred to herein as the "Plan Administrator Defendants."

25.     To the extent that there are additional officers and employees of Aspirus who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Aspirus officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

26.     The Plan is a Section 403(b) "defined contribution" pension Plan under 29 U.S.C. §1102(2)(A) and 1002(34), meaning that Aspirus' contribution to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution Plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct.at 1826. Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the participants.

27.     The Plan currently has about $550,000,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that

were charged against participants' investments. Defendants, however, did not sufficiently attempt to reduce the Plan's expenses or exercise appropriate judgment to monitor each investment option to ensure it was a prudent choice.

28.    With 9,708 participants in the year 2019, the Plan had more participants than 99.82% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year. Similarly, with $551,266,016 in assets in the year 2019, the Plan had more assets than 99.71% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year.

## ERISA'S FIDUCIARY STANDARDS

29.    ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants as a Plan fiduciaries. 29 U.S.C. §1104(a)(1) provides in relevant part:

> [A] fiduciary shall discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and –
>
>     (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the Plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

30.    With certain exceptions, 29 U.S.C. §1103(c)(1) provides in relevant part:

> [T]he assets of a Plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

31.    29 U.S.C. §1109 provides in relevant part:

> Any person who is a fiduciary with respect to a Plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such Plan any losses to the Plan resulting

from each such breach, and to restore to such Plan any profits of such fiduciary which have been made through use of assets of the Plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

32.     Under ERISA, fiduciaries that exercise any authority or control over Plan assets, including the selection of Plan investments and service providers, must act prudently and for the exclusive benefit of participants in the Plan, and not for the benefit of third parties including service providers to the Plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (Plan assets "shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan").

33.     "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.,* 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2nd Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of Plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of each investment option available to Plan Participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); 29 C.F.R. §2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Thus, a defined contribution Plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1828-29.

34.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act §7.

35.     29 U.S.C. §1132(a)(2) authorizes Plan Participants to bring a civil action for appropriate relief under 29 U.S.C. §1109.

## DEFINED CONTRIBUTION INDUSTRY

36.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. Among many options, employers may make contributions on behalf of all employees and/or make matching contributions based on the employees' elective deferrals.  Employees with money in a plan are referred to as "Participants."

### Retirement Plan Services

37.     Defined Contribution plan fiduciaries virtually always hire service providers to deliver a retirement plan benefit to their employees. There is a large group of national retirement plan services providers ("RPSP"), commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of virtually all retirement plans. In some cases, these RPSP have developed all the capabilities "in-house," while in other cases, the RPSP outsource some of the required services to other service providers.

38.     These RPSP deliver all the essential recordkeeping and related administrative ("RK&A") services through standard bundled offerings.

39.     Historically the plan sponsors of 403(b) defined contribution retirement plans sometimes offered their retirement plan to their employees through a "multi-vendor" arrangement

in which the employees could choose among several RPSP.  Over time there are fewer and fewer plan sponsors using a "multi-vendor" approach because it is more costly with no material benefit, less efficient, and requires a significant duplication of services.  In virtually all cases each RPSP has the capabilities to provide the same service to the employees that are delivered by multiple providers in multi-vendor arrangements.  As a result, for several years it has been a best-practice for 403(b) plans to eliminate multi-vendor arrangements and 403(b) plan sponsors have greatly reduced their use of the multi-vendor structure over the past several years.

40.     There is no material difference between services needed or required by 403(b) plans and 401(k) plans.  Virtually all RPSP provide services to both 401(k) plans and 403(b) plans.  The service offerings for these two different defined contribution plan types do not differ in any material way.  Prudent fiduciaries of 403(b) plans can achieve the same reasonable prices for RPS from RPSP as prudent fiduciaries of 401(k) plans.

41.     Similarly, plan fiduciaries using a multi-vendor arrangement can obtain a reasonable RPS fee rate from their RPSP.  There is no material difference between the costs to the RPSP to deliver RPS in a multi-vendor arrangement compared to a single RPSP arrangement.

42.     There are two types of essential RK&A services provided by all RPSP.  For large plans with substantial bargaining power (like the Plan), the first type, "Bundled RK&A," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis). The Bundled RK&A services include, but are not limited to, the following standard services:

    a.  Recordkeeping;
    b.  Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);
    c.  Administrative Services related to converting a plan from one RPSP to another RPSP;

d.  Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.  Maintenance of an employer stock fund (if needed);

f.  Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.  Plan consulting services including assistance in selecting the investments offered to participants;

h.  Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i.  Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j.  Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

43.    The second type of essential RK&A services, hereafter referred to as "Ad Hoc RK&A" services, provided by all RPSP, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees).  The rationale is, for example, that one participant who does not take out a loan should not pay fees to cover the costs of other participants who choose to take a loan.  These "Ad Hoc RK&A" services typically include, but are not limited to, the following:

a.  Loan Processing;

b.  Brokerage services / account maintenance (if offered by the plan);

c.  Distribution services; and

d.  Processing of Qualified Domestic Relations Orders.

44.    For large plans with about 10,000 participants or more, like the Plan, any minor variations in the way that these two types of essential RK&A services, as well as any other RK&A services included in the bundled offering of RK&A services, are delivered has no material impact

on the fees charged by RPSP.  That fact is confirmed by the practice of all RPSP quoting fees for the Bundled RK&A services on a per participant basis without regard for any individual differences in services requested -- which are treated by the RPSP as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RK&A services.

45.     The combination of Bundled RK&A Services and Ad Hoc RK&A services can be referred to as retirement plan services ("RPS").  The vast majority of fees earned by RPSP through providing RPS typically come from the bundled fee for providing the Bundled RK&A services as opposed to the Ad Hoc RK&A services.

46.     The Plan had a standard package of RPS, i.e., Bundled RK&A Services and Ad Hoc RK&A services as described above

47.     RPSP offer the same bundles and combinations of services as their competitors.  As a result, the market for defined contribution retirement plan services has become increasingly price competitive, particularly for large plans that, like the Plan, have a sizable number of participants and a large amount of assets.

48.     Over the past twenty years, the fees that RPSP have been willing to accept for providing retirement plan services has significantly decreased.  RPSP are willing (or competitively required) to accept a lower and more competitive fee as a result of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

49.     By the start of and during the entire Class Period, the level of fees that RPSP have been willing to accept for providing RPS has stabilized, and has not materially changed for large plans, including the Plan.  In other words, reasonable RPS fees paid in 2018 are representative of the reasonable fees for RPS during the entire Class Period.

50.     The underlying cost to a RPSP of providing the RPS to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

51.     The incremental cost for a RPSP to provide RPS for a participant's account does not materially differ from one participant to another and is not dependent on the balance of the participant's account.

52.     RSPS for relatively larger defined contribution plans, like the Plan, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increase because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low.

53.     Therefore, while the total cost to an RPSP to deliver RPS increases as more participants join the Plan, the cost per participant to deliver the RPS decreases.

54.     Since at least the early 2000s, plan fiduciaries and their consultants and advisors have been aware of this cost structure dynamic for RPSP.

55.     Since at least the early 2000s, Defendants should have been aware of this cost structure dynamic for RPSP.

56.     Sponsors of defined contribution plans contract for RPS separately from any contracts related to the provision of investment management services to plan participants.

57.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of RPS performed by the RPSP on behalf of the investment manager.

58.     As a result, RPSP often make separate contractual arrangements with mutual fund providers. For example, RPSP often collect a portion of the total expense ratio fee of the mutual

fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing."

59.     For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the RPSP 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan Participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."

60.     In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to RPS. The difference between the total expense ratio and the revenue sharing is known as the "Net Investment Expense to Retirement Plans."

61.     In the context of defined contribution plans, when a Plan adopts prudent and best practices, the Net Investment Expense to Retirement Plans is the actual amount a Plan Participant pays for the investment management services provided by a portfolio manager.

62.     RPSP typically collect their fees through direct payments from the Plan or through indirect compensation such as revenue sharing, or some combination of both.

63.     Regardless of the pricing structure that the plan fiduciary negotiates with any service provider, the amount of compensation paid to service providers, including the RPSP, must be reasonable.

64.     As a result, plan fiduciaries must understand the total dollar amounts paid to their service providers, including the RPSP, and be able to determine whether the compensation is reasonable by understanding what the market is for the RPS received by the Plan.

65.     Because RPS fees are actually paid in dollars and because of the cost dynamic, the fees paid for RPS are evaluated and compared on a dollar per participant basis.

66.     It is well known among retirement Plan consultants and advisors (who often act as co-fiduciaries to the Plan Fiduciaries) that, all else being equal, a Plan with more participants can and will receive a lower effective per participant RPS fee when evaluated on a per participant basis.

67.     During the Class Period, Defendants knew and/or were aware that a Plan with more participants can and will receive a lower effective per participant RPS fee when evaluated on a per participant basis.

68.     During the Class Period, Defendants knew and/or were aware that the Plan should have received a lower effective per participant RPS fee when evaluated on a per participant basis.

**Investments**

69.     Plan Fiduciaries of a defined contribution Plan have a continuing and regular responsibility to select and monitor all investment options they make available to Plan Participants.

70.     The primary purpose in selecting Plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

71.     In selecting different investment options to make available to Plan Participants, the Plan Fiduciaries are held to the prudent investor standard when choosing investment managers or, alternatively, choosing index investment options. When choosing an active investment option, the analysis is focused on determining whether the portfolio manager is likely to outperform an appropriate benchmark.

72.     Accordingly, the primary focus when choosing an active investment option to make available to Plan Participants is the skill of the portfolio manager. In many cases, a plan sponsor can receive the investment management services of the same portfolio manager through different share classes. When the same investment management services are provided through a mutual fund

with different share classes, the fee paid to the portfolio manager is the same for all share classes.
The difference in the share class fees is the amount of additional fees which can be used to pay for,
among other things, RPS services.

73.     As a result, when a prudent plan fiduciary can select from among several alternative
share classes of the identical investment option, the prudent plan fiduciary selects the share class
that provides the lowest Net Investment Management Expense to Retirement Plans.

## THE PLAN

74.     Prior to 2018, the Plan received RPS from several RPSP.

75.     By January 1, 2018, the Plan was receiving RPS from three RPSP with over 97%
of the Plan's assets being record-kept by Great-West Life and Annuity Co. ("Great-West"), an
RPSP that sometimes brands itself as "Empower Retirement" (Empower).[2]  The fact that the vast
majority of the assets and participants received RPS from Great West gave the Plan substantial
leverage in negotiating its RPS fee with Great West.

76.     At all relevant times, the Plan's fees were excessive when compared with other
comparable 403(b) and 401(k) Plans offered by other sponsors that had similar numbers of plan
participants, and similar amounts of money under management. The fees were also excessive
relative to the RPS services received. These excessive fees led to lower net returns than participants
in comparable 403(b) and 401(k) Plans enjoyed.

77.     During the Class Period, Defendants breached their duties owed to the Plan, to
Plaintiff and all other Plan Participants, by: (1) failing to objectively and adequately review the
Plan's investment portfolio with due care to ensure that each investment option was prudent, in
terms of cost; (2) maintaining certain funds in the Plan despite the availability of identical or

---

[2] The Plan additionally has insignificant RPSP vendor relationships with Lincoln Financial and Voya. For instance, in
2019, Great-West/Empower held 97%-98% of the Plan's assets.

similar investment options with lower costs and/or better performance histories; (3) by failing to monitor the RPS fees paid by the plan to ensure that they were reasonable and, as a result, authorizing the plan to pay objectively unreasonable and excessive RPS fees, relative to the RPS services received; and (4) by failing to adequately disclose fees associated with the Plan to Plan Participants.

78.      Defendants' mismanagement of the Plan, to the detriment of Plan Participants and beneficiaries, breached the fiduciary duties of prudence and loyalty in violation of 29 U.S.C. §1104.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

79.      A plan fiduciary is required to fully understand all sources of revenue received by all service providers, including its RPSP. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the services provided.

80.      Prudent plan fiduciaries ensure they are paying only reasonable fees for RPS by soliciting competitive bids from other service providers to perform the same services currently being provided to the Plan. This is not a difficult or complex process and is performed regularly by prudent plan fiduciaries. Plan fiduciaries need only request a bid from salespeople at other service providers. For Plans with as many participants as Defendants' Plan, some RPSP would require only the number of participants while others might require only the number of participants and the amount of the assets to provide a quote.

81.      Prudent plan fiduciaries have all of this information readily available and can easily receive a quote from other RPSP to determine if the current level of RPS fees is reasonable.

82.      Having received bids, the prudent plan fiduciary can negotiate with its current provider for a lower fee and/or move to a new provider to provide the same (or better) services for

a competitive reasonable fee if necessary.

83.     Prudent plan fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers.

84.     After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated RPS fee. The employer/plan sponsor can pay the recordkeeping fee on behalf of participants, which is the most beneficial to plan participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable RPSP would accept. Usually, however, the employer decides to have the plan (plan participants) pay the RPS fee instead. If the RPS fee is paid by plan participants, the plan fiduciary can allocate the negotiated fee among participant accounts on a per capita or pro-rata basis.

85.     In other words, if the plan negotiates a per participant revenue threshold of $30.00 for the Bundled RK&A, the plan does not need to require that each participant pay $30.00. Rather, the plan fiduciary could determine that an asset-based fee is more appropriate for plan participants and allocate the Bundled RK&A fee pro rata to participants. For example, a 15,000 participant-plan with a $30.00 revenue threshold would pay $450,000 for RPS. If the plan had $3,000,000,000 in assets, then the $450,000 would work out to 1.5 basis points. Accordingly, the plan fiduciary could allocate the $450,000 to plan participants by requiring that each participant pay 1.5 basis points.

86.     In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan. This structure creates situations in which the RPS do not change but, because of market appreciation and contributions to the plan, the revenue received by the RPSP increases. This structure was historically preferred by RPSP because it allowed them to obtain an increase in revenue without having to ask the client to pay a higher fee.

87.     Regardless of the pricing structure, and Plaintiff states no preference, the plan fiduciary must ensure that the fees paid to service providers for RPS are reasonable.

88.     All of these standards were accepted and understood by prudent plan fiduciaries, including Defendants, at all times during the Class Period.

89.     For example, fiduciary best practices based on DOL guidelines, case law, and marketplace experience are as follows:

> 1. Price administrative fees on a per-participant basis.
> 2. Benchmark and negotiate recordkeeping and investment fees separately.
> 3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.
> 4. Benchmark and negotiate recordkeeping and trustee fees at least every other year.
> . . . .
> 7. Review services annually to identify opportunities to reduce administrative costs.[3]

90.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping/RPS costs. *Tussey v. ABB, Inc.,* 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) Plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the Plan); *George v. Kraft Foods Glob.*, Inc., 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

91.     First, a plan fiduciary must pay close attention to the recordkeeping/RPS fees being paid by the Plan. A hypothetical prudent fiduciary tracks the RPSP's expenses by demanding

---

[3] "Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer Investment Consulting (2013).

documents that summarize and contextualize the RPSP's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

92.     Second, to make an informed evaluation as to whether a RPSP or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent hypothetical fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's RPSP. To the extent that a plan's investments pay asset-based revenue sharing to the RPSP, prudent fiduciaries monitor the amount of the payments to ensure that the RPSP's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

93.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the RPS rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping/RPS expenses have grown significantly or appear high in relation to the general marketplace.

94.     That said, by merely soliciting bids from other RPSP, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for similar RPS services and have an idea of a starting point for negotiation.  Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (failure to solicit bids, and higher-than-market recordkeeping fees, supported triable fiduciary breach claim).

95.     This standard of care applies equally to "multi-vendor" arrangements and, in fact, it is even more important for plan fiduciaries to go through this process for each RPSP individually,

as well as evaluating the aggregated RPS received by the plan from the multiple RPSPs to determine if consolidating service providers will benefit plan participants.

96.     Accordingly, when soliciting bids for RPS, prudent fiduciaries ensure that they receive bids both under a scenario in which the plan consolidated all services with one RPSP, as well as scenarios in which some assets remain with multiple RPSP.

### THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR RPS FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE RPS FEES

97.     A plan fiduciary must continuously monitor its RPS fees by regularly soliciting competitive bids to ensure fees paid to covered service providers (such as RPSP) are reasonable.

98.     During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's RPS fees paid to covered service providers, including but not limited to Great-West.

99.     During the Class Period, Defendants failed to regularly monitor the Plan's RPS fees paid to covered service providers, including but not limited to Great-West.

100.     During the Class Period, Defendants knew or should have known that they must regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to Great-West, in order to avoid paying objectively unreasonable fees for RPS services.

101.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to Great-West, in order to avoid paying unreasonable fees for RPS services.

102.     During the Class Period, Defendants knew or should have known that it was in the best interests of the Plan's Participants to ensure that the Plan paid no more than a competitive reasonable fee for RPS services.

103.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants

failed to ensure that the Plan paid no more than a competitive reasonable fee for RPS services.

104.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable fees paid for RPS services.

105.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for RPS services.

106.    During the Class Period and because Defendants failed to regularly monitor the Plan's RPS fees paid to covered service providers, including but not limited to Great-West, the Plan's RPS service fees were significantly higher than they would have been had Defendants engaged in this process.

107.    During the Class Period, given the Plan's objectively unreasonable RPS fees, Defendants engaged in an ineffective fiduciary process in soliciting competitive bids for these services.

108.    During the Class Period and because Defendants did not engage in objectively reasonable and/or prudent efforts when paying fees for RPS services to covered service providers, including but not limited to Great-West, these RPS service fees were significantly higher than they would have been had Defendants engaged in these efforts.

109.    From the years 2018 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual RPS fees illustrating that the Plan had on average 9,522 participants and paid an average effective annual RPS fee of at least approximately $672,033, which equates to an average of at least approximately $71 per participant.

These are the minimum amounts that could have been paid.

### Retirement Plan Service (RPS) Fees

|  | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|
| Participants | 9,151 | 9,708 | 9,708 | *9,522* |
| Est. RPS Fees | $677,162 | $669,468 | $669,468 | *$672,033* |
| Est. RPS Per Participant | $74 | $69 | $69 | *$71* |

110.    From the years 2018 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual RPS fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RPS Fees paid by the Plan (as identified in the table above).

**Comparable Plans' RPS Fees Based on Publicly Available Information from Form 5500[1]**

| Plan | Participants | Assets | RPS Fees | RPS Fees /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Hitachi Vantara Corporation Retirement and Savings Program | 3,890 | $680,441,899 | $174,568 | $45 | Fidelity | White |
| The Boston Consulting Group, Inc. Employees' Profit-Sharing Retirement Fund | 4,369 | $421,208,989 | $185,805 | $43 | Vanguard | White |
| Healthfirst Profit Sharing 401(K) Plan | 4,950 | $227,721,800 | $201,889 | $41 | Vanguard | White |
| Smithfield Foods, Inc. Salaried 401(K) Plan | 6,149 | $500,178,777 | $278,907 | $45 | Great-West | White |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price | White |
| The Boston Consulting Group, Inc. Employees' Savings Plan and Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard | White |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $904,717,349 | $322,496 | $36 | Fidelity | White |
| Children's Medical Center of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | White |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price | White |
| **Aspirus, Inc. Retirement Plan Average Fee** | **9,522** | **$519,283,969** | **$672,033** | **$71** | **Great-West** | **Red** |
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West | White |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | White |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |

[1]Price calculations are based on 2018 Form 5500 information.

111.   From the years 2018 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual RPS fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RPS Fees paid by the Plan (as identified in the table above), with the white data points representing RPS fees that RPS providers offered to (and were accepted by) comparable Plans.



112.   From the years 2018 to 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period,  the table and graph above illustrates that the Plan paid an effective average annual RPS fee paid of at least $71 per participant for RPS services.

113.   From the years 2018 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class

Period, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual RPS fee of around $35 per participant, if not lower.

114.    From the years 2018 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting in the exclusive best interest of the Plan's Participants the Plan actually would have paid significantly less than an average of approximately $672,033 per year in RPS fees, which equated to an effective average of approximately $71 per participant per year.

115.    From the years 2018 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, had Defendants been acting in the best interests of the Plan's Participants, the Plan actually would have paid on average a reasonable effective annual market rate for RPS services of approximately $333,282 per year in RPS fees, which equates to approximately $35 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay more than double what they could otherwise pay for RPS services.

116.    From the years 2018 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its Participants on average approximately $338,751 per year in RPS fees, which equates to on average approximately $36 per participant per year.

117.    From the years 2018 to 2020, and because Defendants did not act in the best

interests of the Plan's Participants, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its Participants a total minimum amount of approximately $1,016,253 in unreasonable and excessive RPS fees.

118.    From the years 2018 to 2020 based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's Participants, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $1,275,677 in RPS fees.

119.    During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's RPS fees it paid to Great-West.

120.    During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RPS fees it paid to Great-West vis-à-vis the fees that other RPS providers would charge for the same services.

121.    During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's administrative costs and RPS fees it paid to Great-West, but Defendants either simply failed to do so, or did so ineffectively given that it paid more than 100% higher for RPS fees than it should have.

122.    During the entirety of the Class Period and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the RPS fees it paid to Great-West,

it would have realized and understood that the Plan was compensating Great-West unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan Participants.  The fees were also excessive relative to the RPS services received, since such services are standard for large 403(b) plans like the Plan.

123.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher RPS fees than they should have been and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties of loyalty and prudence to Plaintiff and Plan Participants.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING INVESTMENT OPTIONS

124.    For all practical purposes, there is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard. Under ERISA, plan fiduciaries are required to engage investment consultants or advisors to the extent that the plan fiduciaries do not have the investment expertise necessary to select and monitor investments under modern portfolio theory.

125.    That accepted process involves, among other things, evaluating the performance history, tenure, and stability of the current portfolio manager; the risk adjusted returns; and the fees.

126.    When an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the portfolio manager that differentially impacts the performance of the investment.

127.    From the perspective of a plan participant, the other critical component of the analysis is the fees.  However, the total expense ratio of an investment option is often comprised of multiple different types of fees, only one of which is specifically associated with the fee of the actual portfolio manager.

128.    As a result, a plan fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the RPSP for RPS services as well as the different fee components of the investment options selected to be made available to plan participants.

129.    Plan fiduciaries of plans as large as the Defendant's Plan are deemed to be "Institutional Investors" and are deemed to have a higher level of knowledge and understanding of the different investment share classes and the different components of fees within the total expense ratio of an investment option.

130.    In fact, as "Institutional Investors," retirement plans often have the ability to access investment options and service structures that are not available or understood by retail investors such as individual plan participants like Plaintiff.

131.    For example, minimum investment requirements and other fees or restrictions are routinely waived for large retirement plans and were waived with the Plan's investments.

132.    As a result, when a plan fiduciary can choose among different share classes (or other types of investment options, e.g., collective trusts) to receive the services of a specific portfolio manager, the plan fiduciary is required to understand all the fees related to the different share classes and collective trusts and choose the share class or collective trust that is in the best interest of the plan participants. This is especially critical when the pricing structure provides compensation to the RPSP from revenue sharing paid by plan participants as part of the total expense ratio of the investment options selected by the plan fiduciaries.

133.    If a plan fiduciary chooses an active investment option, whether either a less costly active investment option or an alternative index option, the plan fiduciary must make a specific and informed finding that the probability that the active portfolio manager will outperform the alternative active investment option or index warrants the higher fees charged by the active portfolio

manager and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of plan participants.

134.    If a plan fiduciary chooses an active investment option when a less costly active investment option or alternative index option is available, but the plan fiduciary does not make a specific and informed finding that the probability that the active portfolio manager will outperform the index (and warranting the higher fees charged by the active portfolio manager) and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of plan participants, the plan fiduciary has acted unreasonably and/or imprudently.

### THE PLAN PAID UNREASONABLY HIGH FEES FOR IMPRUDENT SHARE CLASSES

135.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive shares are targeted at small investors with less bargaining power, while lower cost shares are targeted at larger investors with greater assets.

136.    There is no material difference between share classes other than costs – the funds hold identical investments and have the same portfolio manager.

137.    As noted above, it is well known among institutional investors that mutual fund companies routinely waive investment minimums for large retirement plans, and they did so with the Plan. Moreover, large defined contribution plans such as the Plan have sufficient assets to qualify for most of the lowest cost share classes.

138.    So, unlike individual or retail investors, retirement plan fiduciaries often have access to several different share classes.  A prudent plan fiduciary ensures that the plan selects the share class that provides the greatest benefit to plan participants given the institutional advantages provided to retirement plans in relation to retail investors. The share class that provides the greatest

benefit to plan participants is the share class that gives plan participants access to the portfolio managers at the lowest net fee for the services of the portfolio manager and is referred to as the "Net Investment Expense to Retirement Plans."

139.    As described in more detail below, choosing the share class that provides the lowest Net Investment Expense to Retirement Plans is always the prudent choice because the use of the share class that provides the lowest Net Investment Expense to Retirement Plans will result in one of the following superior options: 1) The amount of the fee extraction to cover the RPS fee will be lower; or 2) the amount of excess revenue being credited back to participant accounts is greater.

140.    During the Class Period, Defendants knew or should have known that they are required to select the share classes that provide the greatest benefit to plan participants, i.e., the lowest Net Investment Expense to Retirement Plans.

141.    During the Class Period, Defendants knew or should have known that it must engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants, i.e., the lowest Net Investment Expense to Retirement Plans.

142.    During the Class Period, in many cases Defendants did not use share classes that provide the greatest benefit to plan participants and in some cases even switched from one share class to a different share class that charged a higher Net Investment Expense to Retirement Plans.

143.    During the Class Period, Defendants did not engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants, i.e., the lowest Net Investment Expense to Retirement Plans.

144.    The following charts identify Defendants' share class investments during the Class Period vis-à-vis the prudent alternatives that provide the greatest benefit to plan participants, i.e., the lowest Net Investment Expense to Retirement Plans:

| | Defendants' Investment | | | | Prudent Alternative Share Class | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| DCZRX | Delaware Small Cap Core R6 | 0.71% | 0.00% | 0.71% | DCCIX | Delaware Small Cap Core I | 0.85% | 0.25% | 0.60% | 18% |
| JTTYX | JP Morgan Smartretirement 2020 R6 | 0.41% | 0.00% | 0.41% | JTTIX | JPMorgan SmartRetirement® 2020 R5 | 0.51% | 0.15% | 0.36% | 14% |
| JNSYX | JP Morgan Smartretirement 2025 R6 | 0.43% | 0.00% | 0.43% | JNSIX | JPMorgan SmartRetirement® 2025 R5 | 0.53% | 0.15% | 0.38% | 13% |
| JSMYX | JP Morgan Smartretirement 2030 R6 | 0.44% | 0.00% | 0.44% | JSMIX | JPMorgan SmartRetirement® 2030 R5 | 0.54% | 0.15% | 0.39% | 13% |
| SRJYX | JP Morgan Smartretirement 2035 R6 | 0.45% | 0.00% | 0.45% | SRJIX | JPMorgan SmartRetirement® 2035 R5 | 0.55% | 0.15% | 0.40% | 13% |
| SMTYX | JP Morgan Smartretirement 2040 R6 | 0.46% | 0.00% | 0.46% | SMTIX | JPMorgan SmartRetirement® 2040 R5 | 0.56% | 0.15% | 0.41% | 12% |
| JSAYX | JP Morgan Smartretirement 2045 R6 | 0.46% | 0.00% | 0.46% | JSAIX | JPMorgan SmartRetirement® 2045 R5 | 0.56% | 0.15% | 0.41% | 12% |
| JTSYX | JP Morgan Smartretirement 2050 R6 | 0.46% | 0.00% | 0.46% | JTSIX | JPMorgan SmartRetirement® 2050 R5 | 0.56% | 0.15% | 0.41% | 12% |
| JFFYX | JP Morgan Smartretirement 2055 R6 | 0.45% | 0.00% | 0.45% | JFFIX | JPMorgan SmartRetirement® 2055 R5 | 0.55% | 0.15% | 0.40% | 13% |
| JAKYX | JP Morgan Smartretirement 2060 R6 | 0.44% | 0.00% | 0.44% | JAKIX | JPMorgan SmartRetirement® 2060 R5 | 0.54% | 0.15% | 0.39% | 13% |
| JSIYX | JP Morgan Smartretirement Income R6 | 0.40% | 0.00% | 0.40% | JSIIX | JPMorgan SmartRetirement® Income R5 | 0.50% | 0.15% | 0.35% | 14% |
| WFPRX | Wells Fargo Spec Md Cp Val R6 | 0.71% | 0.00% | 0.71% | WFPAX | Wells Fargo Special Mid Cap Value A | 1.14% | 0.55% | 0.59% | 20% |
| | Average | 0.49% | 0.00% | 0.49% | | Average | 0.62% | 0.19% | 0.42% | 13.94% |

145.   The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including, but not limited to, standard reports prepared by the Defendants' RPS provider as well as the 408(b)(2) plan sponsor fee disclosure documents provided to the Plan by its RPSP.

146.     Based upon data and information reflected in the charts above, the average excessive fee paid by Participants during the Class Period as a result of Defendants' failure to use the prudent alternative share classes that provide the greatest benefit to Plan Participants was approximately 13.94%. There is no rational reason for a prudent plan fiduciary to choose an investment option that effectively charges a fee that is almost 14% higher than an alternative investment option that provides the identical services of the same portfolio manager.

147.     During the Class Period, and had Defendants engaged in a prudent process to select the share class of a selected portfolio manager that provides the greatest benefit to plan participants, the Plan would not have selected the share classes listed in the "Defendants' Investment" column of the chart above.

148.     During the Class Period, and had Defendants engaged in a prudent process, once a portfolio manager had been selected, the Defendants would have selected the share classes listed in the "Prudent Alternative Share Class" column of the chart above.

149.     During the Class Period, and had Defendants engaged in an objectively reasonable search for, and selection of, the share class that provided the greatest benefit to Plan Participants, the Plan would not have selected the funds in the "Defendants' Investment" column in the chart above.

150.     During the Class Period, and had Defendants engaged in an objectively reasonable search for, and selection of, the share class that provided the greatest benefit to Plan Participants, the Plan would have selected the funds in the "Prudent Alternative Share Class" columns of the charts above.

151.     During the Class Period, and had Defendants been acting in the best interests of the Plan's Participants, the Plan would not have selected the funds in the "Defendants' Investment"

columns of the charts above.

152.    During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, the Plan would have selected the funds in the "Prudent Alternative Share Class" columns of the charts above.

153.    During the entirety of the Class Period, Defendants knew or should have known about the existence of alternative share classes of the same mutual funds currently selected and performed the analysis to determine the share class that provides the greatest benefit to Plan Participants,  as identified in the "Prudent Alternative Share Class" column of the chart above.

154.     During the entirety of the Class Period, Defendants knew or should have known to transfer the Plan funds into the share class that provides the greatest benefit to Plan Participants, as identified in the "Prudent Alternative Share Class" column of the chart above.

155.    A hypothetical prudent fiduciary would not select share classes that result in higher fees to Plan Participants when share classes that result in lower fees to Plan Participants are available for the identical portfolio management services.

156.    During the entirety of the Class Period, Defendants selected share classes that resulted in higher fees to Plan Participants when share classes of the identical investment option were available that would have resulted in lower fees, to the substantial detriment of Plaintiff and the Plan's Participants.

157.    During the entirety of the Class Period and because Defendants selected share classes that resulted in higher fees when share classes that resulted in lower fees were available to the Plan for the identical investment option, the Plaintiff and the Plan Participants did not receive any additional services or benefits other than a higher cost for Plaintiff and the Plan Participants.

158.    As an example of Defendants' failure to engage in an objectively reasonable search for, and selection of, the share class that provides the greatest benefit to Plan Participants and that was available to the Plan during the Class Period, consider the Delaware Small Cap Core R6 (DCZRX), which was selected by the Plan fiduciaries and made available to Plan Participants in the Plan from 2018 through at least 2020.

159.    As of December 31, 2019, Plan Participants had invested more than approximately $28,755,543 in this investment option. The portfolio managers of this investment option were Christopher S. Adams, Michael S. Morris and Francis X. Morris (Adams, Morris & Morris). Plan Participants can receive the identical portfolio management services of Adams, Morris & Morris through several different investment options (share classes) with different fee structures. The fee structures for the varying share classes of this investment option, all managed by Adams, Morris & Morris, are set forth in the chart below:

| Example of Different Share Class Fee Levels for Identical Portfolio Management Services | | | |
|---|---|---|---|
| | Delaware Small Cap Core I | Delaware Small Cap Core R | Delaware Small Cap Core R6 |
| Share Class | I Class | R Class | R6 Class |
| Investment Advisor | Delaware | Delaware | Delaware |
| Portfolio Managers | Christopher S. Adams, Michael S. Morris, Francis X. Morris | Christopher S. Adams, Michael S. Morris, Francis X. Morris | Christopher S. Adams, Michael S. Morris, Francis X. Morris |
| Ticker | DCCIX | DCCRX | DCZRX |
| Portfolio Management Fee | 0.64% | 0.64% | 0.64% |
| Total Expense Ratio | 0.85% | 1.35% | 0.71% |
| Revenue Sharing Credit | 0.25% | 0.75% | 0.00% |
| Net Investment Expense to Retirement Plans | 0.60% | 0.60% | 0.71% |

160.    The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period including, but not limited to, standard reports prepared by the Defendants' RPS provider as well as the 408(b)(2) plan sponsor fee disclosure documents provided to the Plan by its RPSP.

161.    Because the underlying data and information reflected in the chart above were readily available to Defendants during the Class Period, Defendants did not need to "scour the market" when selecting and monitoring investment options for the Plan.

162.    In the second to last row of the chart above, "Revenue Sharing Credit," is the portion of the "Total Expense Ratio" that is allocable to the provision of RPS (and in some cases other) services and is not disclosed to Plan Participants. As a result, a Plan Participant without this information would be unable to determine the actual cost of the portfolio management services.

163.    As a result, the fee paid for the portfolio management services of the portfolio managers Adams, Morris & Morris to pursue the identical investment strategy with the same goals, objectives, and risk profile is the "Net Investment Expense to Retirement Plans" set forth in the bottom row.

164.    As illustrated in the chart above, the Delaware Small Cap Core I (DCCIX) has the lowest "Net Investment Expense to Retirement Plans" at 0.60%.  Despite the Total Expense Ratio being higher, the Delaware Small Cap Core I (DCCIX) provides the greatest benefit to Plan Participants because the 0.25% in revenue sharing that is allocable to RPS services is a credit that is returned to the Participants directly or used as a credit against the RPS fee. If the 0.25% allocable to RPS services exceeds the actual RPS fee, then the excess can also be returned to the Plan and its Participants.

165.    During the Class Period, Plan Participants would have received the lowest possible fee for the portfolio management services of Adams, Morris & Morris if invested in the Delaware Small Cap Core I (DCCIX).

166.    When two identical service options are readily available (in this case the portfolio management services of Adams, Morris & Morris), and would be known as part of the standard of care related to selecting and monitoring investment options, a prudent plan fiduciary ensures that the least expensive of those options is selected.

167.    A prudent plan fiduciary understands that the higher "sticker" price of the RPS fee portion of the expense ratio is not relevant since the RPS service provider returns excess revenue to the Plan and Plan Participants.

168.    The DOL requires plan fiduciaries to understand all the fees related to all the various services provided to the Plan and its Participants.  By selecting an investment option that charges more for identical portfolio management services, the Defendant plan fiduciaries breached their duty.

169.    As illustrated in the chart below, which is based on the $28,755,543 that the Plan invested in Delaware Small Cap Core R6 (DCZRX) as of December 31, 2019, because Defendants did not select the share class that provided the greatest benefit to Plan Participants, Delaware Small Cap Core I (DCCIX), Defendants caused substantial monetary damage and detriment to Plaintiff and the Plan's Participants.



170.    The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period.

171.    A hypothetical prudent fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on at least a quarterly basis, which would have identified and selected the share class that provides the greatest benefit to plan participants.

172.    A hypothetical prudent fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on at least a quarterly basis, would have identified the share class that provides the greatest benefit to Plan Participants, and would have transferred the Plan's investments into the prudent share classes at the earliest opportunity.

173.    During the entirety of the Class Period, Defendants: 1) did not conduct an impartial and objectively reasonable review of the Plan's investments on at least a quarterly basis; 2) did not

identify the prudent share classes available to the Plan; 3) did not transfer the Plan's investments into these prudent share classes at the earliest opportunity; and 4) actually transferred Participants' assets from the share classes that provide the lowest Net Investment Expense to Retirement Plans to more expensive share classes, all to the substantial detriment of Plaintiff and the Plan's Participants.

174.    During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable process when selecting its share classes, Defendants caused unreasonable and unnecessary losses to Plaintiff and the Plan's Participants through 2020 in the amount of approximately $474,795 and as detailed in the following chart:

| Actual Investment Lineup | | | |
| --- | --- | --- | --- |
| | **2018** | **2019** | **2020** |
| **Net Investment Expense to Retirement Plans** | $2,041,849 | $2,494,311 | $2,494,311 |

| Prudent Alternative Share Class | | | |
| --- | --- | --- | --- |
| **Net Investment Expense to Retirement Plans** | $1,937,253 | $2,351,481 | $2,351,481 |

| | 2018 | 2019 | 2020 |
| --- | --- | --- | --- |
| **Est. Investment Damages** | $104,597 | $142,829 | $142,829 |
| **Compounding Percentage (VIIIX)** | | 31.48% | 18.41% |
| **Est. Cumulative Investment Damages** | $104,597 | $280,353 | $474,795 |

175.    During the entirety of the Class Period and by failing to recognize that the Plan was invested in share classes that resulted in higher fees when share classes that resulted in lower fees to retirement Plan Participants were available for the same investment and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties to Plaintiff and Plan Participants.

## DEFENDANTS' INVESTMENTS IN THE PLAN

176.    A prudent fiduciary will consider all plan investments, including "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts § 100 cmt. b(1).

177.    While higher-cost mutual funds may outperform a less-expensive option over the short term, they rarely do so over a longer term. See Jonnelle Marte, Do Any Mutual Funds Ever Beat the Market? Hardly, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutualfunds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices that looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); see also Index funds trounce actively managed funds: Study, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-activelymanaged-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

178.    Funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds, 67 J. Econ. Behav. & Org. 871, 873 (2009); *see also* Jill E. Fisch, Rethinking the Regulation of Securities Intermediaries, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

179.    During the Class Period, the chart below identifies several investment options that Defendants selected and/or made available to Plan Participants as compared to prudent alternative and less expensive options (both active and passive):

| Defendants' Investment | | | | | Prudent Alternative Investments | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| JTTYX | JP Morgan Smartretirement 2020 R6 | 0.41% | 0.00% | 0.41% | VITWX | Vanguard Instl Trgt Retire 2020 Instl | 0.09% | 0.00% | 0.09% | 356% |
| JNSYX | JP Morgan Smartretirement 2025 R6 | 0.43% | 0.00% | 0.43% | VRIVX | Vanguard Instl Trgt Retire 2025 Instl | 0.09% | 0.00% | 0.09% | 378% |
| JSMYX | JP Morgan Smartretirement 2030 R6 | 0.44% | 0.00% | 0.44% | VTTWX | Vanguard Instl Trgt Retire 2030 Instl | 0.09% | 0.00% | 0.09% | 389% |
| SRJYX | JP Morgan Smartretirement 2035 R6 | 0.45% | 0.00% | 0.45% | VITFX | Vanguard Instl Trgt Retire 2035 Instl | 0.09% | 0.00% | 0.09% | 400% |
| SMTYX | JP Morgan Smartretirement 2040 R6 | 0.46% | 0.00% | 0.46% | VIRSX | Vanguard Instl Trgt Retire 2040 Instl | 0.09% | 0.00% | 0.09% | 411% |
| JSAYX | JP Morgan Smartretirement 2045 R6 | 0.46% | 0.00% | 0.46% | VITLX | Vanguard Instl Trgt Retire 2045 Instl | 0.09% | 0.00% | 0.09% | 411% |
| JTSYX | JP Morgan Smartretirement 2050 R6 | 0.46% | 0.00% | 0.46% | VTRLX | Vanguard Instl Trgt Retire 2050 Instl | 0.09% | 0.00% | 0.09% | 411% |
| JFFYX | JP Morgan Smartretirement 2055 R6 | 0.45% | 0.00% | 0.45% | VIVLX | Vanguard Instl Trgt Retire 2055 Instl | 0.09% | 0.00% | 0.09% | 400% |
| JAKYX | JP Morgan Smartretirement 2060 R6 | 0.44% | 0.00% | 0.44% | VILVX | Vanguard Instl Trgt Retire 2060 Instl | 0.09% | 0.00% | 0.09% | 389% |
| JSIYX | JP Morgan Smartretirement Income R6 | 0.40% | 0.00% | 0.40% | VITRX | Vanguard Instl Trgt Retire Inc Instl | 0.09% | 0.00% | 0.09% | 344% |

| | Defendants' Investment *(continued)* | | | | | | Prudent Alternative Investments *(continued)* | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) | | |
| BAGIX | Baird Aggregate Bond Inst | 0.30% | 0.00% | 0.30% | FXNAX | Fidelity® US Bond Index Instl Prem | 0.03% | 0.00% | 0.03% | 1100% | | |
| DCZRX | Delaware Small Cap Core R6 | 0.71% | 0.00% | 0.71% | FSSNX | Fidelity® Small Cap Index Instl Prem | 0.03% | 0.00% | 0.03% | 2740% | | |
| DFUEX | DFA US Social Core Equity 2 | 0.23% | 0.00% | 0.23% | FXAIX | Fidelity® 500 Index Institutional Prem | 0.02% | 0.00% | 0.02% | 1433% | | |
| DODFX | Dodge & Cox International Stock | 0.63% | 0.10% | 0.53% | SFNNX | Schwab Fdmtl Intl Lg Co Idx | 0.25% | 0.00% | 0.25% | 112% | | |
| GSIUX | Goldman Sachs Emerging Mkt Debt R6 | 0.85% | 0.00% | 0.85% | BEHKX | BlackRock Emerging Markets Bond K | 0.60% | 0.00% | 0.60% | 42% | | |
| ODVYX | Oppenheimer Developing Markets I | 0.97% | 0.25% | 0.72% | FPADX | Fidelity® Emerging Markets Idx Instl Prm | 0.08% | 0.00% | 0.08% | 800% | | |
| PCLIX | PIMCO Commodities Strategy Instl | 0.78% | 0.00% | 0.78% | DCMSX | DFA Commodity Strategy Institutional | 0.32% | 0.00% | 0.32% | 144% | | |
| POSKX | Primecap Odyssey Stock | 0.66% | 0.10% | 0.56% | FXAIX | Fidelity® 500 Index Institutional Prem | 0.02% | 0.00% | 0.02% | 3633% | | |
| VTIAX | Vanguard Total Intl Stock Index Admiral | 0.11% | 0.00% | 0.11% | FSPSX | Fidelity® International Index InstlPrm | 0.04% | 0.00% | 0.04% | 214% | | |
| VITSX | Vanguard Total Stock Market Index Institutional | 0.03% | 0.00% | 0.03% | FXAIX | Fidelity® 500 Index Institutional Prem | 0.02% | 0.00% | 0.02% | 100% | | |
| IIVGX | Voya Growth and Income Portfolio Class I | 0.62% | 0.00% | 0.62% | FXAIX | Fidelity® 500 Index | 0.02% | 0.00% | 0.02% | 4033% | | |
| WFPRX | Wells Fargo Spec Md Cp Val R6 | 0.71% | 0.00% | 0.71% | VMVAX | Vanguard Mid-Cap Value Index Admiral | 0.07% | 0.00% | 0.07% | 914% | | |
| | *Average* | *0.50%* | *0.02%* | *0.48%* | | *Average* | *0.11%* | *0.00%* | *0.11%* | *870.68%* | | |

180.    The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including but not limited to Plaintiff's Plan quarterly statements, the Plan's Summary Description, and the Plan's participant fee disclosures.

181.    During the Class Period and based on the charts above, the average Net Investment Expense to Retirement Plans of the investments selected and made available to Plan Participants by the plan fiduciaries identified above was 0.50%, or 50 basis points.

182.     During the Class Period and based on the charts above, the investment options selected by the plan fiduciaries were 870.68% more expensive than prudent alternative and less expensive options covering the same asset categories and approaches.

183.     During the Class Period, Defendants did not engage in an objectively reasonable process when selecting funds for the Plan.

184.     During the Class Period and because Defendants did not engage in an objectively reasonable process when selecting funds for the Plan, Defendants actually selected the funds identified in the "Defendants' Investment" column in the charts above.

185.     During the Class Period and had Defendants engaged in an objectively reasonable process when selecting funds for the Plan, Defendants would not have selected the funds identified in the "Defendants' Investment" column in the charts above.

186.     During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, Defendants would not have selected the funds identified in the "Defendants' Investment" column in the charts above.

187.     During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, Defendants would have selected funds with lower expense ratios than those funds actually selected by Defendants as identified in the "Defendants' Investment" column in the charts above.

188.     During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, Defendants would have selected the funds identified in the "Prudent Alternative Investments" column in the charts above.

189.     During the Class Period, Plaintiff had no knowledge of Defendants' process for selecting investments and regularly monitoring them to ensure they remained prudent.

190.    During the Class Period, Plaintiff had no knowledge of how the fees charged to and paid by the Plan Participants compared to any other funds.

191.    During the Class Period, Plaintiff did not know about the availability of lower-cost and better-performing (and other essentially identical) investment options that Defendants failed to reasonably offer because Defendants provided no comparative information to allow Plaintiff to evaluate and compare Defendants' investment options.

192.    During the Class Period, Defendants failed to reasonably and properly evaluate the true cost of the services of each portfolio manager under the fee structure negotiated with Great-West, thereby paying fees that were more than necessary to the detriment of Plaintiff and the Plan's Participants.

193.    During the Class Period and had Defendants chosen investment options similar or identical to the funds identified in the "Prudent Alternative Investments" column in the charts above, the Plan's Participants would have been received the exact same portfolio management services but at a lower cost.

194.    During the Class Period and because Defendants imprudently chose investment options that were not similar or identical to the funds identified in the "Prudent Alternative Investments" column in the charts above, Defendants' caused unreasonable and unnecessary losses to Plaintiff and Plan's Participants.

195.    During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options. The chart above demonstrates that the expense ratios of the Plan's investment options between the years 2018 to 2020 were more expensive by significant multiples of comparable actively managed and passively managed

alternative funds in the same investment style. A reasonable investigation would have revealed the existence of these lower-cost alternatives.

196.    During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, resulting in the selection of funds identified in the "Defendants' Investment" column in the charts above, Plaintiff and the Plan's Participants incurred actual expenses and costs as identified in the "Actual Investment Lineup" portion of the chart below.

197.    During the Class Period and had Defendants acted in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, Defendants would have prudently chosen lower-cost investment alternatives as identified in the "Alternative Investment Lineup" portion of the chart below.

198.    During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, Defendants caused objectively unreasonable and unnecessary losses to Plaintiff and the Plan's Participants in the amount of approximately $5,615,859 through 2020 and as detailed in the following chart:

| Actual Investment Lineup | | | |
|---|---|---|---|
| | **2018** | **2019** | **2020** |
| Net Investment Expense to Retirement Plans | $2,041,849 | $2,494,311 | $2,494,311 |

| Prudent Alternative Investments | | | |
|---|---|---|---|
| Net Investment Expense to Retirement Plans | $698,597 | $880,552 | $880,552 |

| | | | |
|---|---|---|---|
| Est. Investment Damages | $1,343,252 | $1,613,759 | $1,613,759 |
| Compounding Percentage (VIIIX) | | 31.48% | 18.41% |
| Est. Cumulative Investment Damages | $1,343,252 | $3,379,866 | $5,615,859 |

199.    The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including but not limited to Plaintiff's Plan quarterly statements, the Plan's Summary Description, and the Plan's participant fee disclosures.

200.    During the entirety of the Class Period and by failing to engage in an objectively reasonable investigation process when selecting its investments, Defendants breached their fiduciary duties of loyalty and prudence to Plaintiff and Plan Participants.

## CLASS ACTION ALLEGATIONS

201.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

202.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Aspirus Retirement, Inc.
> Plan (excluding the Defendants or any participant/beneficiary who
> is a fiduciary to the Plan) beginning January 1, 2018 and running
> through the date of judgment.

203.    The Class includes almost 10,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

204.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

205.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

206.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

207.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

208.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so

that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

209.    Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

210.    The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

211.    The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

212.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

213.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

## FIRST CLAIM FOR RELIEF
### Breaches of Duties of Loyalty and Prudence of ERISA, as Amended
### (Plaintiff, on behalf of herself and Class, Against All Defendants – RPS Fees)

214.    Plaintiff restates the above allegations as if fully set forth herein.

215.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

216.    29 U.S.C. §1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan.

217.    Defendants, as fiduciaries of the Plan, are responsible for selecting a RPSP that charges reasonable RPS fees.

218.    During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RPS fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

219.    During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to: ensure that the Plan's RPS fees were reasonable, manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

220.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's RPSP to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding RPS and the significant bargaining power the Plan had to negotiate the best fees.

221.    During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiff, by failing to employ a prudent and loyal process and by failing to critically or objectively evaluate the cost and performance of the Plan's RPSP in comparison to other RPSP options.

222.    Through these actions and omissions, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. §1104(a)(1)(A), (B).

223.    Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

224.    As a result of Defendants' breach of fiduciary duty of prudence and loyalty with respect to the Plan, the Plaintiff and Plan Participants suffered objectively unreasonable and unnecessary monetary losses.

225.    Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), (a)(3).

## SECOND CLAIM FOR RELIEF
### Breaches of Duties of Loyalty and Prudence of ERISA, as Amended
### (Plaintiff, on behalf of herself and Class, Against All Defendants – Investment Management Fees)

204.    Plaintiff restates the above allegations as if fully set forth herein.

205.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

206.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in managing the investments of the Plan.

207.    Defendants, as fiduciaries of the Plan, are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

208.    During the Class Period, Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

209.    During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

210.    Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments were prudent choices for the Plan and to remove imprudent investment options regardless of how long said investments had been in the Plan.

211.    During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

212.    Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan Participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis and eliminating funds or share classes that did not serve the best interest of Plan

Participants, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

213.    Defendants failed to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's investments and fees in comparison to other investment options. Defendants selected and retained for years as Plan investment options mutual funds with high expenses relative to other investment options that were readily available to the Plan at all relevant times.

214.    Through these actions and omissions, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(A), (B).

215.    Defendants failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

216.    As a result of Defendants' breach of their fiduciary duties of prudence and loyalty with respect to the Plan, as aforesaid, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

217.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), (a)(3).

**THIRD CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of herself and Class, Against All Defendants – RPS Fees)**

226.     Plaintiff restates the above allegations as if fully set forth herein.

227.     Defendants had the authority to appoint and remove members or individuals responsible for Plan RPS fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

228.     In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan RPS fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

229.     Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

230.     The excessive RPS fees paid by the Plan inferentially suggest that Aspirus and the Board breached their duty to monitor by, among other things:

a.     Failing to monitor and evaluate the performance of individuals responsible for Plan RPS fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high RPS expenses;

b.     Failing to monitor the process by which the Plan's RPSP were evaluated and failing to investigate the availability of lower-cost recordkeepers; and

c.    Failing to remove individuals responsible for Plan RPS fees whose performance was inadequate in that these individuals continued to pay the same RPS costs even though benchmarking and using other similar comparators would have showed that maintaining Great-West as the RPSP at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

231.    As the consequences of the foregoing breaches of the duty to monitor for RPS fees the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

232.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RPS fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**FOURTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of herself and Class, Against All Defendants – Investment Management Fees)**

233.    Plaintiff restates the above allegations as if fully set forth herein.

234.    Defendants had the authority to appoint and remove members or individuals responsible for Plan investment management and were aware that these fiduciaries had critical responsibilities for the Plan.

235.    In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan investment management to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

236.    Defendants had a duty to ensure that the individuals responsible for Plan investment management possessed the needed qualifications and experience to carry out their duties (or use

qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

237.    The excessive investment management and share class fees paid by the Plan inferentially suggest that Aspirus and the Board breached their duty to monitor by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses, improper choice of fund share classes, and inefficient fund management styles that adversely affected the investment performance of the funds' and their Participants' assets as a result of these individuals responsible for Plan imprudent actions and omissions;

b.    Failing to monitor the process by which Plan investments were evaluated, failing to investigate the availability of lower-cost share classes, and failing to investigate the availability of lower-cost collective trust vehicles; and

c.    Failing to remove individuals responsible for Plan administration whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan Participants' retirement savings.

238.    As a result of Defendants' foregoing breaches of the duty to monitor, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

239.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan

administration. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule  23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.      A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.      An Order requiring Defendant Aspirus to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. §1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Aspirus as necessary to effectuate relief, and to prevent Aspirus' unjust enrichment;

F.      An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.      An award of pre-judgment interest;

I.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      Such other and further relief as the Court deems equitable and just.

Dated this 20th day of April, 2021

s/ Troy W. Haney
Troy W. Haney
HANEY LAW FIRM, P.C.
330 E. Fulton
Grand Rapids, MI 49503
Telephone: (616) 235-2300
Fax: (616) 459-0137
E-Mail: thaney@troyhaneylaw.com

James A. Walcheske, State Bar No. 1065635
Scott S. Luzi, State Bar No. 1067405
Paul M. Secunda, State Bar No. 1074127
*Pro Hac Vice Motions Pending*
WALCHESKE & LUZI, LLC
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

Attorneys for Plaintiff